UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES HENRY BUIE, #174915,

        Petitioner,

                                    CASE NO. 2:14-CV-11100

v.                                 HONORABLE SEAN F. COX

STEVEN RIVARD,

        Respondent.

_____/

**OPINION AND ORDER DENYING THE HABEAS PETITION,
DENYING A CERTIFICATE OF APPEALABILITY, AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

## I.    Introduction

Michigan prisoner James Henry Buie ("Petitioner"), currently confined at the St. Louis
Correctional Facility in St. Louis, Michigan, has filed a *pro se* petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254 asserting that he is being held in violation of his constitutional rights.
Petitioner was convicted of two counts of first-degree criminal sexual conduct involving a victim
under the age of 13, Mich. Comp. Laws § 750.520b(1)(a), three counts of first-degree criminal
sexual conduct involving the use of a weapon, Mich. Comp. Laws § 750.520b(1)(c), and possession
of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b, following a jury trial
in the Kent County Circuit Court. He was sentenced, as a fourth habitual offender, Mich. Comp.
Laws § 769.12, to concurrent terms of life imprisonment on the criminal sexual conduct convictions
and a consecutive term of two years imprisonment on the felony firearm conviction in 2007.

In his pleadings, Petitioner raises claims concerning the use of two-way video-conferencing
for medical and expert testimony from Dr. Vincent Palusci and DNA expert Rodney Wolfarth, the

denial of his request for substitute counsel, his absence from the courtroom during part of jury voir dire, and the admission of other acts evidence.  For the reasons stated herein, the Court finds that his claims lack merit and denies the habeas petition.  The Court also denies a certificate of appealability and denies leave to proceed in forma pauperis on appeal.

## II.    Facts and Procedural History

Petitioner's convictions arise from his sexual assault of a woman and the two girls whom she was babysitting at the girls' home in Grand Rapids, Michigan in 2001.  The Michigan Court of Appeals set forth the relevant facts, which are presumed correct on habeas review.  *See* 28 U.S.C. § 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009).  Those facts are as follows:

> On June 27, 2001, defendant entered a house in Grand Rapids, Michigan, and sexually assaulted B.S. and minors L.S., age 13, and D.S., age 9. At the time of the incident, L.S. and D.S. lived in the house with their mother, their two brothers, and their mother's roommate. B.S., who was a close family friend, was at the house that night to babysit the children while their mother was out. L.S. and D.S.'s mother testified that she knew that B.S. had used cocaine in the past, but believed that B.S. was "clean" when she asked her to watch the children. B.S. later admitted, however, that she was still using cocaine at the time of the incident.

> B.S. arrived at the house at approximately 7:00 p.m. Between 1:00 and 2:00 a.m., she went and sat down on the front porch. B.S. initially reported that defendant forced her back inside the house at gunpoint. According to B.S.'s trial testimony, however, defendant approached her while she was seated on the porch. He asked to use a telephone. B.S. consented and allowed defendant to enter the house. She then propositioned defendant to exchange sexual favors for cocaine and led him into a large closet. Once inside the closet, defendant pointed a gun at B.S.'s head and penetrated her vagina with his penis. He also attempted to penetrate her anally.

> During the assault, B.S. heard the roommate of the minor's mother at the front door. After the roommate entered the house, defendant struck him in the head with a gun. The roommate fell to the floor, unconscious. At that point, L.S., D.S., and the other two children entered the room. L.S. and D.S. testified that they saw defendant holding a gun to B.S.'s head. Defendant then ordered B.S. and all four of the children to enter the closet and lie down.

> According to L.S., defendant subsequently moved her from the closet to the couch.

2

Once on the couch, defendant penetrated her vagina with his penis. During the assault, defendant told L.S. that he loved her and that if she tried to escape, he would kill her family. Defendant assaulted L.S. again in her bedroom and in the kitchen. At some point, he attempted to penetrate her anally. After the assault in the kitchen, defendant took L.S. back to the couch and told her to put her head down. Defendant then moved D.S. from the closet to the kitchen. According to D.S., defendant penetrated her vagina with his penis. L.S. remained on the couch with her head down and could hear D.S. crying in the kitchen. Defendant then moved D.S. back to the closet and assaulted her again. Defendant held a gun throughout the assaults.

After defendant assaulted D.S. in the closet, he left the house and B.S. called the police. L.S. and D.S. were unable to identify the man who assaulted them. The roommate described the man who hit him as a black male, but was also unable to identify defendant as his assailant. At trial, B.S. identified defendant as the man who assaulted her, L.S., and D.S. She testified that she had never seen him before the night of the incident and had not seen him since that night.

Dr. Vincent Palusci examined L.S. and D.S. approximately six hours after the assaults. Dr. Palusci testified that his findings "were indicative of sexual conduct of direct trauma to the genitals, and in the case of [L.S.], also her anus, which were not explainable in any other manner than the histories provided" by the girls. Christine Dunnick, a forensic nurse, examined B.S. after the assaults and found a "half a centimeter perianal tear, which is near the anal opening," consistent with the history provided by B.S. Dr. Palusci and nurse Dunnick collected evidence, including vaginal and rectal swabs, during the examinations and placed the evidence in rape kits. The kits were then sealed and released to the appropriate law enforcement agencies.

The trial court designated Rodney Wolfarth as an expert in the area of DNA analysis. Wolfarth conducted DNA testing on the swabs in the rape kits and the nightgown worn by L.S. during the assaults, as well as a fitted sheet, a pillowcase, and cigarette butts found at the scene. Wolfarth testified that he found sperm cells in the vaginal and rectal swabs taken from L.S. When he tested the sperm cells from the rectal swab, "it was consistent with a mixture and the mixture was consistent with [L.S.] and an unknown semen donor, designated as Donor 1." Wolfarth found the same mixture on the nightgown and found DNA from Donor 1 on the fitted sheet, pillowcase, and cigarette butts. Wolfarth was unable to identify a match for the DNA at that time, but stated that once DNA testing is completed, the "probative DNA result is entered into what is a DNA data bank called CODIS, which stands for Combined DNA Indexing System." The data are stored to allow for comparisons to convicted felons' profiles at a later date. When a match is made between a DNA sample and a known profile, it is referred to as a CODIS hit.

At defendant's trial in this case, one of the prosecution's witnesses, LB, testified that

defendant had sexually assaulted her in 2004, when she was 13 years old. L.B. told her sister that defendant had assaulted her and, shortly thereafter, the incident was reported to the police. DNA analysts subsequently determined that defendant's DNA matched sperm cells from L.B.'s vaginal swab and underwear. The results of the DNA testing were entered into CODIS.

On February 1, 2005, a CODIS hit occurred when the system matched defendant's DNA to the DNA samples taken in this case. Thereafter, a search warrant to conduct a buccal swab for defendant's DNA was obtained. Defendant was initially uncooperative, but eventually consented to the swab. Joel Schultze, who was designated by the trial court as an expert in DNA analysis, testified that the DNA sample was tested and compared to Wolfarth's previous findings. According to Schultze, the DNA material on the nightgown, pillowcase, fitted sheet, and cigarette butts were consistent with defendant's DNA. In addition, the DNA mixture in the rectal swab taken from L.S. was consistent with a mixture of DNA from L.S. and defendant at 10 of 13 locations. Defendant's DNA was not found on any of the swabs taken from D.S., but Schultze explained that even if penetration occurs, "if there's no ejaculation, the male DNA is not going to be there." Schultze further testified: "In the Caucasian population the probability is 1[in] 1.4 quintillion that [a] randomly chosen person would match the profiles on the cigarettes butts, nightgown, pillowcase and sheet. In the African–American, it's 1[in] 188.9 quadrillion." As for the rectal swab match, "in the Caucasian population it would be approximately one to two million—one in one to two million people would be able to contribute to that mixture on the rectal swab. In the African–American, it would be one in approximately 100,000 to 175,000 African–Americans."

Defendant was convicted and sentenced as previously stated.

*People v. Buie*, 285 Mich. App. 401, 403-06 (2009).

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising several claims, including those presented on habeas review. The court remanded the case to the trial court to determine whether the two-way video-conference testimony was necessary to further an important public policy or state interest and, in doing so, declined to find that Petitioner waived the issue. *Id.* Both parties appealed to the Michigan Supreme Court, which denied the appeal but added that the trial court must determine whether there was good cause for the video-conference testimony under Michigan Court Rule 6.006(C) and whether

Petitioner consented. *People v. Buie*, 485 Mich. 1105, 779 N.W.2d 81 (2010) (one justice concurring in part and dissenting in part).

On remand, the trial court conducted an evidentiary hearing and found that there were public policy and state interests, such as cost savings, convenience of the witnesses, and avoiding delay, which justified the use of video-conferencing and that Petitioner consented through counsel to the procedure. On appeal, the Michigan Court of Appeals reversed, finding that the public policy and state interests were not important enough to outweigh Petitioner's confrontation rights and that, based upon the evidentiary hearing testimony, neither Petitioner nor his counsel consented to the video-conferencing. The court remanded the case for a new trial. *People v. Buie*, 291 Mich. App. 259, 804 N.W.2d 790 (2011). The prosecutor appealed to the Michigan Supreme Court. The Michigan Supreme Court reversed, finding that Petitioner consented to the video-conferencing procedure, and remanded the case to the Michigan Court of Appeals for consideration of Petitioner's other issues. *People v. Buie*, 491 Mich. 294, 817 N.W.2d 33 (2011).

On remand, the Michigan Court of Appeals denied relief on Petitioner's remaining claims and affirmed his convictions. *People v. Buie*, 298 Mich. App. 50, 825 N.W.2d 361 (2012). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Buie*, 494 Mich. 854, 830 N.W.2d 766 (2013).

Petitioner thereafter filed his federal habeas petition raising claims concerning the use of two-way video-conferencing for medical and expert testimony, the denial of his request for substitute counsel, his absence from the courtroom during part of jury voir dire, and the admission of other acts evidence. Respondent has filed an answer to the petition contending that it should be denied for lack of merit.

III.    **Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28

U.S.C. § 2241 *et seq.*, sets forth the standard of review that federal courts must use when considering

habeas petitions brought by prisoners challenging their state court convictions.   The AEDPA

provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable
>        application of, clearly established Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of
>        the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that

contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts

that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless

arrives at a result different from [that] precedent.'"   *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)

(per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535

U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to

'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts of petitioner's case."   *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.

6

However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The United States Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). A habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain federal habeas relief, a state prisoner must show that the state court's rejection of a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.; see also White v. Woodall*, _ U.S. _, 134 S. Ct. 1697, 1702 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, _ U.S. _, 135 S. Ct. 1372, 1376 (2015). A habeas petitioner

7

cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Woods v. Etherton*, _ U.S. _, 136 S. Ct. 1149, 1152 (2016).

Section 2254(d)(1) limits a federal court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412;  *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer*, 538 U.S. at 71-72.  Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  *Harrington*, 562 U.S. at 100.  Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of "clearly established law" are to be determined solely by Supreme Court precedent.  Thus, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" and "[i]t therefore cannot form the basis for habeas relief under AEDPA."  *Parker v. Matthews*, 567 U.S. _, 132 S. Ct. 2148, 2155 (2012) (per curiam); *see also Lopez v. Smith*, _ U.S. _ 135 S. Ct. 1, 2 (2014) (per curiam).  The decisions of lower federal courts may be useful in assessing the reasonableness of the state court's decision. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

8

Lastly, a state court's factual determinations are presumed correct on federal habeas review. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV.    Discussion

### A.    Video-Conferencing Claim

Petitioner first asserts that he is entitled to habeas relief because the use of two-way video-conferencing for medical and expert testimony from Dr. Vincent Palusci and DNA expert Rodney Wolfarth at trial violated his confrontation rights. Respondent contends that this claim lacks merit.

When the use of the two-way video conferencing procedure arose at trial, defense counsel stated: "I understand this is this particular courtroom's first attempt at this type of technological proceeding, and my client has – wanted to question the veracity of these proceedings, so I'll leave that to the Court's discretion." 2/22/07 Trial Tr., p. 39.

In reviewing this claim on direct appeal, the Michigan Supreme Court set forth the following additional facts from the state court evidentiary hearing:

> On remand, the trial court held an evidentiary hearing. At that hearing, the prosecutor was asked:
>
> Q. Now, do you recall specifically any conversation you may have had with defense counsel or the Court concerning the use of the video technology from these witnesses from remote locations?
>
> A. I don't recall specifically what was said between [defense counsel] and myself. I do know, you know, thinking about that, that regarding Dr. Palusci's testimony, that I don't believe she objected to it being the video feed because she wanted—she knew the testimony—

* * *

I don't remember [defense counsel's] exact words, but she had indicated that Dr. Palusci—she believed Dr. Palusci's testimony was going to be damaging, so she wanted him, whether it be live or on the screen, done with as quickly as possible.

Defense counsel agreed that she had discussed the use of video testimony before trial. When asked whether she was "agreeable" to the use of video testimony by Palusci and Wolfarth, defense counsel explained:

Understanding that [the witnesses were not local] and the nature of this particular case and the fact that it had been dragging out for quite a while by this time, I felt—I was in agreement that this would be the best way to have [Palusci and Wolfarth] testify without subjecting them to being here physically.

When asked whether there was "a benefit to having the testimony by video rather than having testimony live," defense counsel responded:

I didn't think there was any problem. I wouldn't call it a benefit or a burden. It was just two individuals testifying on a tele—on a big screen rather than sitting here. They were sworn as I was this afternoon. They were asked questions by the prosecution. They were cross-examined by me. There was some redirection. I believe I even re-crossed on at least one of the witnesses. And it was done.

Although defense counsel stated that "every conversation [she] had with [defendant] throughout [her] representation was done either in the lock-up area here at the—at the courthouse or with him sitting at the defense table," when asked whether she would have "discussed with [defendant] this—the testimony—the video procedures beforehand," she answered that "[d]espite [defendant's] contentiousness, [she] discussed everything with him" and that "[defendant] was well aware of the prosecutor's desire to have [the witnesses] testify via video."

Defense counsel was then asked whether defendant himself had responded when informed that Palusci and Wolfarth would testify by video. She answered:

Oh, yeah, of course. [Defendant] objected to everything. It was—you know, it was classic Buie from beginning to end, "This is wrong. That is wrong." But, you know, yeah. And I believe I made a statement on the record indicating [defendant's] disdain for the two individuals testifying via video.

She was then asked:

Q. Okay. And where you said, "I understand this is this particular courtroom's first attempt at this type of technological proceeding and my client is wanting to question the veracity of these proceedings, so I'll leave that to the Court's discretion," is it

fair to say then that that statement is you expressing [defendant's] objection to the procedure?

A. Absolutely.

However, when questioned further about that statement, defense counsel explained:

A. [Defendant] was questioning the veracity of everything. It was just—it was a blanket James Buie, this is a farce, and that was pretty much his attitude from beginning to end.

Q. Okay. Was that specifically as regarding the use of the video testimony itself, or was this about everything?

A. I didn't take it as that. I took it as he had a problem with every piece of this case, every—from beginning to end up until the point that he was too cowardly to come into the courtroom at sentencing. So, no, I didn't take it as specifically he had a problem with the—the—I mean I can't get into his mind, but this was what I was dealing with from the—from the beginning to the end of this case, so I didn't specifically take it as he had a problem with the videotape. It's just he had a problem with the fact that he was on trial for raping two little girls.

At this point, the trial court had defense counsel read this Court's order, *Buie*, 485 Mich. 1105, 779 N.W.2d 81, explaining that the court would be asking defense counsel to address a conclusion reached in Justice Corrigan's separate statement "so that as clearly as possible, there be no question about what [defense counsel] intended or—or what happened." After defense counsel had done so, the court asked defense counsel:

Q. According to Justice Corrigan, you never objected to the use of a two-way, interactive video technology for taking Dr. Palusci and Dr. Wolfarth's testimony. Is that true or false?

A. I never—I never objected.

Q. So the statement of Justice Corrigan is true?

A. It is.

Defendant also testified at the evidentiary hearing. He explained that he and defense counsel did not get along and that he had requested a new attorney. He further claimed that he had no knowledge of the video testimony until it was about to happen. With regard to the video testimony, defendant explained:

A. I told [defense counsel] that I just didn't—it just didn't feel right. I said, "Shouldn't they be in the witness chair?"

Q. And what did [defense counsel] do after you told her that?

A. No, I told her—I told her I didn't feel right about it, they should be in the witness chair, and she said, "Everything is going to be all right." I said, "Well, I want you to get up and object to it because it just don't seem right."

Q. Okay. And did she get up and say something?

A. Yes.

Q. And what did she say?

A. She didn't say the word object like I told her. She—

Q. But this statement that we've read at this hearing today about questioning the veracity of the proceedings, is that when she made that statement?

A. Yes.

Following this hearing, the trial court issued a written opinion and order holding that there was no error in permitting the video testimony. After hearing the witnesses' testimony and evaluating their demeanor and credibility, the court found that "Defendant consented to the taking of testimony by video when his counsel stated on the record that Defendant wanted to question the veracity [of the] proceedings but left it to [the] trial court's discretion whether to proceed" and "according to [defense counsel], Defendant did not object to the video testimony. His intent was to object to the proceedings in general because he disliked being prosecuted."

*Buie*, 491 Mich. at 299-303.  The Michigan Court of Appeals disagreed with the trial court's finding that Petitioner consented to the two-way video procedure and ruled that Petitioner's confrontation rights were violated.  The Michigan Supreme Court reversed that decision.

The Sixth Amendment to the United States Constitution provides:  "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.  The Confrontation Clause "guarantees the defendant a face-to-face meeting

with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988).  This

right to a physical face-to-face meeting, however, is not absolute and may be compromised when

"considerations of public policy and necessities of the case" so warrant.  *Maryland v. Craig*, 497

U.S. 836, 848 (1990).  In *Craig*, the Supreme Court emphasized that a defendant's right to physical,

face-to-face confrontation may be infringed only when "necessary to further an important public

policy" and only when "the reliability of the testimony is otherwise assured."  *Id.* at 850.  In

upholding the use of a one-way closed circuit television procedure for a child witness in *Craig*, the

Supreme Court acknowledged the important state interests underlying the procedure and the fact

that it preserved the core values of the Confrontation Clause – testimony under oath, opportunity

for contemporaneous cross-examination, and observation of the witness – and that it was

functionally equivalent to live, in-person testimony.  *Id.* at 851.

    It is well-established that constitutional rights, including the right to confrontation, can be

waived.  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 314 n.3 (2009).  Waiver is the intentional

relinquishment or abandonment of a known right.  *United States v. Olano*, 507 U.S. 725, 733

(1993).  While some rights can only be waived personally by the defendant, and only after being

fully informed of those rights, *see, e.g., Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938) (right to

counsel), other rights fall within the realm of trial strategy and can be waived by counsel.  *See*

*generally Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Confrontation rights can be waived by

defense counsel, *see Diaz v. United States*, 223 U.S. 442, 450-53 (1912); *United States v. Gamba*,

541 F.3d 895, 900 (9th Cir. 2008) (counsel may deliberately, and as part trial tactics or strategy

waive, defendant's confrontation rights), particularly where the waiver occurs in open court and

the defendant does not object.  *See United States v. Joseph*, 333 F.2d 1012, 1013 (6th Cir. 1964);

13

*see also United States v. Chun Ya Cheung*, 350 F. App'x 19, 21-22 (6th Cir. 2009).

Citing *Coy* and *Craig*, as well as *Olano, Melendez-Diaz, and Diaz*, the Michigan Supreme

Court found that Petitioner, through defense counsel, acquiesced to the two-way video conferencing

procedure and ruled that his confrontation claim was waived. The court explained in relevant part:

> Immediately before Palusci testified, defense counsel stated:
>
> I understand this is this particular courtroom's first attempt at this type of technological proceeding, and my client has—wanted to question the veracity of these proceedings, so I'll leave that to the Court's discretion.
>
> A review of the record indicates that this statement did not constitute an objection for several obvious reasons. First, the statement is not phrased as an objection, and indeed the word "objection" is altogether missing. Second, as Justice Corrigan explained, "When defense counsel stated 'I'll leave that to the Court's discretion,' defendant essentially acquiesced to the taking of testimony using two-way interactive video technology." *Buie*, 485 Mich. at 1107, 779 N.W.2d 81 (Corrigan, J., concurring in part and dissenting in part). Third, in the immediate aftermath of counsel's statement, the trial court had a member of its information technology staff explain how the video equipment worked, which clearly suggests that the court believed that the statement did not constitute an objection but constituted a request for further information about the operation of the video equipment. Fourth, immediately after the discussion regarding the equipment, Palusci testified without further complaint by counsel. If counsel's statement had been intended as an objection, we would expect that she might have questioned the trial court's response of having the staff explain how the equipment would work, since that response would have been entirely unresponsive to an objection. Fifth, no statement or complaint was made before the video testimony of Wolfarth. The record strongly suggests that the trial court concluded, and did so correctly, that defense counsel's statement had not constituted an objection to the procedures the court adopted.
>
> ...we must defer to the trial court's findings of fact—specifically, that defendant did not object to the use of the video testimony. That this decision constituted reasonable trial strategy is a presumption that was never addressed, much less rebutted. Indeed, at the evidentiary hearing, defense counsel stated that she did not have any problem with Palusci and Wolfarth testifying by video. Accordingly, the trial court's findings were not clearly erroneous, and we believe that defendant, through his counsel, waived his right of confrontation and "extinguished any error" that may have been committed.

*Id*. at 316-18.

14

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The trial record indicates that defense counsel acquiesced in the court's use of the two-way video conferencing procedure on the record at trial and that Petitioner did not voice an objection to that procedure. Additionally, at the evidentiary hearing on the matter, defense counsel admitted that she did not object at trial and that she had no problem with the two witnesses testifying via two-way video conferencing. Given such circumstances, as well as the foregoing case law, it cannot be said that the Michigan Supreme Court's waiver determination is unreasonable.

Moreover, even if there was no waiver by counsel and a confrontation error occurred, Petitioner is not entitled to relief from this Court. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 117-18 (2007) (confirming that the *Brecht* standard applies in "virtually all" habeas cases); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in the Sixth Circuit). Confrontation errors, like other trial errors, are subject to harmless error analysis. *Delaware v. VanArsdall*, 475 U.S. 673, 684 (1986).

In this case, while the two witnesses did not appear in person, they did appear "live" via two-way video conferencing. Defense counsel was able to confront and cross-examine them in real time. The parties and the jury were able to view the witnesses and assess their credibility and demeanor. Moreover, the witnesses' testimony involved medical testing, research, and scientific information, which would not have varied if they were present in the courtroom. Such testimony

is qualitative and analytical and unlike victim or eyewitness testimony where in-person demeanor or mannerisms, the witness's relationship to the defendant, and the like are more crucial for evaluating veracity. The prosecution also presented significant evidence of guilt. Given such circumstances, Petitioner fails to establish that any error in allowing the two-way video conferencing testimony had a substantial or injurious effect on the jury's verdict. Habeas relief is not warranted on this claim.

### B.   Substitute Counsel Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in denying his request for substitute counsel where there was a breakdown in the attorney-client relationship. Respondent contends that this claim lacks merit.

The Sixth Amendment to the United States Constitution provides for the right to counsel. U.S. CONST. AMEND. VI. The right to counsel encompasses the right to counsel of choice, but that right is generally cognizable only to the extent that a defendant can retain counsel with private funds; an indigent defendant does not have an absolute right to choose appointed counsel. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). An indigent defendant who is dissatisfied with appointed counsel must show "good cause" to warrant the substitution of counsel because an indigent defendant does not have an absolute right to counsel of choice. *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990). The decision regarding whether to appoint new counsel at a defendant's request is committed to the sound discretion of the trial court. *United States v. Trujillo*, 376 F.3d 593, 606 (6th Cir. 2004). The Sixth Circuit cites three factors to consider when evaluating a trial court's denial of a request for substitute counsel: (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict

between the attorney and the defendant is so great that it results in a total lack of communication preventing an adequate defense. *Benitez v. United States*, 521 F.3d 625, 632 (6th Cir. 2008) (citing *Iles*, 906 F.2d at 1131, n.8). These factors are balanced with the public's interest in the prompt and efficient administration of justice. *Iles*, 906 F.2d at 1131, n. 8 (citing *Wilson*, 761 F.2d at 280); *see also United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001). A court "must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988).

In this case, the Michigan Court of Appeals denied relief on this claim. The court explained:

> Defendant argues that the trial court erred when it did not either appoint substitute counsel or hold an evidentiary hearing when defendant sought substitute counsel based upon a breakdown in communications between himself and his trial counsel. We disagree.
>
> "The decision regarding substitution of counsel is within the sound discretion of the trial court and will not be upset on appeal absent a showing of an abuse of that discretion." *People v. Mack*, 190 Mich. App. 7, 14, 475 N.W.2d 830 (1991).
>
> As discussed earlier, the Sixth Amendment guarantees a defendant's right to counsel. *Russell*, 471 Mich. at 187, 684 N.W.2d 745. However, defendant "is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced." *Mack*, 190 Mich. App. at 14, 475 N.W.2d 830. "A defendant is only entitled to a substitution of appointed counsel when discharge of the first attorney is for 'good cause' and does not disrupt the judicial process." *People v. O'Brien*, 89 Mich. App. 704, 708, 282 N.W.2d 190 (1979) (quotation marks and citation omitted). The circumstances that would justify good cause rest on the individual facts in each case. *Id*.
>
> Our Supreme Court has recognized that, while an allegation of attorney disinterest warrants consideration by a trial court of the defendant's allegation, a defendant's conviction will not be set aside, even in the absence of judicial consideration of the defendant's allegation, if "the record does not show that the lawyer assigned to represent [the defendant] was in fact inattentive to his [or her] responsibilities." *Ginther*, 390 Mich. at 442, 212 N.W.2d 922. In addition, this Court has recognized that "[a] complete breakdown of the attorney-client relationship or disagreement

17

over whether a particular line of defense should be pursued may justify appointing new counsel." *O'Brien*, 89 Mich. App. at 708, 282 N.W.2d 190. In *Meyers*, 124 Mich. App. at 165, 335 N.W.2d 189, the defendant requested substitute trial counsel because the defendant was having difficulty communicating with his counsel. "[The defendant] informed the [trial] court that he objected to his attorney because he was not the attorney of the defendant's choice, that he and his attorney disagreed about the case, and that he did not like the language his defense attorney used toward him." *Id*. at 166, 335 N.W.2d 189. However, the defendant had failed to cooperate with his counsel, and counsel expressed a willingness to work with the defendant. *Id*. "[The defendant] did not assert that his attorney was inadequate, lacking in diligence, or disinterested in his case." *Id*. Therefore, this Court held that there was not enough evidence to prove that the attorney-client relationship had broken down to a point where the appointment of substitute counsel was necessary. *Id*. Further, this Court has held that a defendant may not deliberately cause a breakdown of the attorney-client relationship by not cooperating with his counsel and then assert that there is a good reason for appointing new counsel. *Id*. at 166–167, 335 N.W.2d 189; *see also People v. Cumbus*, 143 Mich. App. 115, 121, 371 N.W.2d 493 (1985) (noting that the defendant was not entitled to substitution of counsel because the breakdown in the attorney-relationship was caused by the defendant and because defendant failed to demonstrate that he had been prejudiced by the trial court's denial of his motion for substitute counsel).

In the present case, the first preliminary examination was scheduled for June 15, 2005, but defendant refused to attend. At the preliminary hearing on September 22, 2005, as described in part II(B) of this opinion, defendant's trial counsel noted that she was having difficulty contacting defendant because he was being moved around to various locations. She also noted that "the only time that somebody from my office had a chance to speak with him he was unresponsive." Further, at the preliminary hearing on October 3, 2005, defendant stated to the trial court, "Your honor, I never did really get a chance to talk to my prior attorney, the—the female. So I never did really know who was my attorney." In a November 30, 2005, letter from trial counsel to defendant, details of the problems between trial counsel and defendant were set forth. By way of that correspondence, defense counsel forwarded copies of the police report, amended felony information, DNA results, and a competency report to defendant. She also bluntly warned defendant that his attempt to manipulate the system by "playing [the] crazy card" and being disruptive in court would not be successful.

In an August 15, 2006, pro se motion, defendant requested substitute counsel because trial counsel had yet to visit him in jail and because there had allegedly been a breakdown in his relationship with the public defenders office from the beginning. Defendant wrote, "I have been verbally and in writing accused [sic] of this case in their minds." The trial court did not consider the merits of defendant's claims in his pro per motion because counsel represented defendant.

18

The evidence in the record demonstrates that defendant and trial counsel did not have a completely amicable relationship. However, "the record does not show that [defendant's attorney] was in fact inattentive to [her] responsibilities," inadequate, or disinterested. *Ginther*, 390 Mich. at 441–442, 212 N.W.2d 922; *Meyers*, 124 Mich. App. at 166–167, 335 N.W.2d 189. To the contrary, the evidence demonstrates that well over a year before trial began, defense counsel had gathered necessary materials, was familiar with the case, and was realistically informing defendant of the damaging nature of the DNA evidence and frivolity of his claimed insanity. Defendant complained that trial counsel had not visited him in jail; however, it appears from the record that this was not because of a lack of effort on counsel's part. For a time, defendant was being moved around to different facilities, and counsel was unable to contact him. When counsel sent representatives to speak with defendant, he was nonresponsive, and he also refused to attend a preliminary hearing. By not responding to trial counsel's staff inquiries, defendant cannot now use lack of communication as justification for substitute counsel when he failed to respond. *See Meyers*, 124 Mich. App. at 166–167, 335 N.W.2d 189; *see also Cumbus*, 143 Mich. App. at 121, 371 N.W.2d 493. Accordingly, the trial court's failure to appoint substitute counsel was not an abuse of discretion, *Mack*, 190 Mich. App. at 14, 475 N.W.2d 830, because it did not fall outside the range of principled outcomes, *People v. Terrell*, 289 Mich. App. 553, 558–559, 797 N.W.2d 684 (2010).

*Buie*, 298 Mich. App. at 66-70.

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The state trial court acted well within its discretion in denying Petitioner's request for substitute counsel. Petitioner has not shown good cause for the substitution of appointed counsel under the multi-factor test employed by the Sixth Circuit. While the first factor, the timeliness of the request, and the second factor, the adequacy of the trial court's inquiry, weigh in Petitioner's favor, the other factors do not. The third factor, whether a conflict between counsel and Petitioner was so great that it resulted in a total lack of communication preventing an adequate defense, weighs against Petitioner because he fails to show that there was any such conflict. The record indicates that counsel's difficulties in meeting with Petitioner were caused by prison transfers and Petitioner's own refusal to consult with her

associates.  The record also reveals that counsel provided Petitioner with materials relevant to his case, advised him about his prospects, and was prepared for trial.  Petitioner fails to show that he and counsel were unable to communicate or work together to present a defense at trial.  The last factor, the public's interest in the prompt and efficient administration of justice, weighs against Petitioner because the substitution of counsel would have delayed the proceedings and resulted in additional costs to the parties and the court.  Petitioner fails to show that substitute counsel was warranted.  More importantly, for purposes of federal habeas review, he fails to establish that the Michigan Court of Appeals' ruling on this issue was unreasonable.  Habeas relief is not warranted on this claim.

### C.      Absence During Part of Jury Voir Dire Claim

Petitioner next asserts that he is entitled to habeas relief because he was absent during part of jury voir dire in violation of his right to be present during all critical stages of the trial. Respondent contends that this claim lacks merit.

The United States Supreme Court has recognized that a criminal defendant has a fundamental right to be present at all critical stages of trial.  *See Rushen v. Spain*, 464 U.S. 114, 117 (1983); *see also United States v. Riddle*, 249 U.S. F.3d 529, 534 (6th Cir. 2001) (a criminal defendant has a constitutional right to be present at "all stages of the trial where his absence might frustrate the fairness of the proceedings").  This right is derived from the Due Process Clause of the Fifth and Fourteenth Amendments, as well as from the Sixth Amendment's Confrontation Clause.  *United States v. Gagnon*, 470 U.S. 522, 526 (1985).  Voir dire is a critical stage of a criminal trial at which a defendant has a constitutional right to be present because "[j]ury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free

20

from ethnic, racial, or political prejudice, or predisposition about the defendant's culpability." *Gomez v. United States*, 490 U.S. 858, 873 (1989) (citations omitted).

The right to be present at trial, however, may be knowingly and voluntarily waived. *See Riddle, supra*, 249 F.3d at 534; *see also Taylor v. United States*, 414 U.S. 17, 19-20 (1973). Moreover, waiver may be implied from a defendant's conduct. *See United States v. Marshall*, 248 F.3d 525, 535 (6th Cir. 2001); *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000).

The Michigan Court of Appeals denied relief on this claim finding that Petitioner asked to be excused from the courtroom when he became frustrated with the proceedings, that he did not knowingly and voluntarily waive his right to be present, and that he was not disruptive during that time period so as to warrant exclusion, but that any error arising from his absence during part of jury voir dire was harmless due to its brevity and the overwhelming evidence of his guilt. *Buie*, 298 Mich. App. at 56-60.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Even assuming that Petitioner's absence during part of jury voir dire violated his right to be present at all critical stages of the trial, he is nonetheless not entitled to relief from this Court because any such error was harmless. As discussed, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see also O'Neal*, 513 U.S. at 445. The denial of a criminal defendant's right to be present at a critical stage of the trial proceedings is generally subject to harmless error review. *Rushen*, 464 U.S. at 117-18 & n.2; *United States v. Toliver*, 330 F.3d 607, 611 (3rd Cir. 2003) (citing cases); *United States v. Harris*, 9 F.3d 493, 499 (6th Cir. 1993)). Petitioner fails to establish

that he was prejudiced by his absence from the courtroom during part of jury voir dire. Defense counsel was present to protect his interests and he fails to show that his presence would have affected the jury voir dire. Additionally, given the significant evidence of guilt presented at trial, particularly the DNA evidence, it cannot be said that Petitioner's absence during part of jury voir dire had a substantial effect or influence on the jury's verdict. Habeas relief is not warranted on this claim.

### D.      Admission of Other Acts Evidentiary Claim

Lastly, Petitioner asserts that he is entitled to habeas relief because the trial court erred in admitting other acts evidence - evidence of another criminal sexual assault that he committed against a 13-year-old girl in 2004. Respondent contends that this claim is not cognizable and/or lacks merit.

A federal court may only grant habeas relief to a person who is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69-70); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)); *Bugh v.*

22

*Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

The Michigan Court of Appeals denied relief on this claim. The court explained:

Defendant argues that the testimony of LB, the victim of a 2004 sexual assault by defendant, should not have been admitted at trial because it was inadmissible other-acts evidence under MRE 404(b), was more prejudicial than probative and therefore inadmissible under MRE 403, and inadmissible under MCL 768.27a because that statute violates the Ex Post Facto Clauses of the United States and Michigan Constitutions, U.S. Const., art. I, § 10; Const. 1963, art. 1, § 10. We disagree.

At trial defendant objected to the admission of LB's testimony, and the prosecution argued that the evidence was admissible under MCL 768.27a. The trial court ruled that the testimony was admissible; therefore, this issue is preserved for appeal. *People v. Connor*, 209 Mich. App. 419, 422, 531 N.W.2d 734 (1995) (issues raised before and decided by the trial court are preserved for review.). However, defendant did not object to LB's testimony on the basis that it violated MRE 404(b) or the Ex Post Facto Clauses of the United States and Michigan Constitutions. Thus, these claims are unpreserved for appellate review. *See People v. McPherson*, 263 Mich. App. 124, 137, 687 N.W.2d 370 (2004) ("Defendant failed to preserve this claim of error because he did not specifically object at trial on this ground....").

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v. Pattison*, 276 Mich. App. 613, 615, 741 N.W.2d 558 (2007). However, "[w]hen the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *Id*. (quotation marks and citation omitted). We review defendant's unpreserved arguments for plain error. *Carines*, 460 Mich. at 763–765, 597 N.W.2d 130.

MCL 768.27a states that, "in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." A listed offense includes first-degree criminal sexual conduct, MCL 750.520b, and second-degree criminal sexual conduct, MCL 750.520c. *People v. Dobek*, 274 Mich. App. 58, 88 n. 16, 732 N.W.2d 546 (2007) ("The listed offenses [set forth in then MCL 28.722(e)(x )] include the various forms of criminal sexual conduct."). In *Pattison*, 276 Mich.App. at 620, 741 N.W.2d 558, this Court held that, "[i]n cases involving the sexual abuse of minors, MCL 768.27a now allows the admission of other-acts evidence to demonstrate the likelihood of a defendant's criminal sexual behavior toward other minors." The *Pattison* Court concluded that the trial court did not err when it admitted testimony "regarding defendant's alleged sexual abuse of four other

23

minors." *Id.* at 618, 741 N.W.2d 558. However, this Court cautioned "trial courts to take seriously their responsibility to weigh the probative value of the evidence against its undue prejudicial effect in each case before admitting the evidence. *See* MRE 403." *Id.* at 621, 741 N.W.2d 558; *see also People v. Watkins*, 491 Mich. 450, 481–486, 818 N.W.2d 296 (2012) (holding that evidence that is admissible under MCL 768.27a may still be excluded under MRE 403). MRE 403 states in part that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

[W]hen applying MRE 403 to evidence admissible under MCL 768.27a, courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect. That is, other-acts evidence admissible under MCL 768.27a may not be excluded under MRE 403 as overly prejudicial merely because it allows a jury to draw a propensity inference....

This does not mean, however, that other-acts evidence admissible under MCL 768.27a may never be excluded under MRE 403 as overly prejudicial. There are several considerations that may lead a court to exclude such evidence. These considerations include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [*Watkins*, 491 Mich. at 487–488, 818 N.W.2d 296.]

In the present case, defendant was charged with multiple counts of first-degree criminal sexual conduct. He had previously been convicted of sexually assaulting LB when she was 13 years old. LB's testimony established that defendant had a history of sexually assaulting young girls. The testimony also indicated that the manner in which the sexual assaults occurred in both instances were similar. Specifically, defendant engaged his victims initially under a ruse and then proceeded to forcefully sexually assault them while threatening them with a weapon. Multiple penetrations occurred, and the sexual positions were similar. The subject crimes and the incident involving LB also occurred within three years of one another. The evidence of each crime was supported by DNA evidence, establishing defendant as the offender. Evidence of the assault on LB was also relevant in explaining how the police had come into possession of defendant's DNA for comparison in this case. Although the evidence was highly prejudicial, it was also highly probative of defendant's propensity for sexually assaulting young girls. *See Pattison*, 276 Mich. App. at 615–616, 741 N.W.2d 558 (holding that evidence of the tactics the defendant used against a prior victim to commit CSC was probative of whether he used the same tactics to gain sexual favors from his daughter and its admission did not violate MRE 403). Evidence is not unfairly prejudicial under

24

MRE 403 merely because it damages a party's case. *People v. Vasher*, 449 Mich. 494, 502, 537 N.W.2d 168 (1995). Rather, undue prejudice refers to "an undue tendency to move the tribunal to decide on an improper basis." *Id*. at 501, 537 N.W.2d 168. In this case, defendant has not demonstrated that the probative value of the evidence was substantially outweighed by the danger of undue prejudice. The trial court did not abuse its discretion by admitting this evidence under MCL 768.27a.

Defendant also claims that the application of MCL 768.27a violates the Ex Post Facto Clauses of the United States and Michigan Constitutions because the sexual assaults occurred before the enactment of this particular statute. However, he concedes that this Court has already determined that this statute is not unconstitutional on this basis. Defendant states that he raised the issue solely to preserve the issue for further review. In *Pattison*, 276 Mich. App. at 619, 741 N.W.2d 558, this Court observed that this "altered standard does not lower the quantum of proof or value of the evidence needed to convict a defendant." Thus, this Court held that "the standard for obtaining a conviction against [the] defendant has not changed, and the application of MCL 768.27a to this case does not violate the Ex Post Facto Clause." *Id*.; *see also People v. Wilcox*, 280 Mich. App. 53, 55–56, 761 N.W.2d 466 (2008), *rev'd on other grounds* 486 Mich. 60, 781 N.W.2d 784 (2010); *People v. Schultz*, 278 Mich. App. 776, 778–779, 754 N.W.2d 925 (2008). Under this Court's previous holdings, defendant's claim is meritless. *Pattison*, 276 Mich. App. at 619, 741 N.W.2d 558; *Wilcox*, 280 Mich. App. at 55–56, 761 N.W.2d 466; *Schultz*, 278 Mich. App. at 778–779, 754 N.W.2d 925.

Defendant also argues that the evidence was not admissible under MRE 404(b). In *Watkins*, 491 Mich. at 472–481, 818 N.W.2d 296, our Supreme Court concluded that MCL 768.27a permits a prosecutor to introduce evidence of a defendant's commission of another listed offense against a minor without having to justify its admissibility under MRE 404(b). As previously discussed, the evidence was properly admitted under MCL 768.27a. Therefore, the prosecution did not also have to justify the admission of LB's testimony under MRE 404(b).

Accordingly, LB's testimony was properly admitted under MRE 768.27a.

*Buie*, 298 Mich. App. at 70-74 (footnote omitted).

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, to the extent that Petitioner asserts that the trial court erred in admitting evidence under Michigan law, he merely alleges violations of state law which do not justify federal habeas relief. *See, e.g., Bey*, 500 F.3d at 519. State courts are the

final arbiters of state law and the federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). Habeas relief does not lie for perceived errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Second, Petitioner fails to establish that the admission of the other acts evidence resulted in a federal due process violation. As to the admission of other acts evidence, the United States Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *Dowling v. United States*, 493 U.S. 342, 352–53 (1990). Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id*. at 513; *Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003). Petitioner thus fails to state a claim upon which habeas relief may be granted as to such matters.

Moreover, even if Petitioner states a cognizable claim as to the other acts evidence, he is not entitled to relief. He fails to show that the admission of the other acts evidence rendered his trial fundamentally unfair. The other acts evidence was relevant and admissible on the issue of identity, common plan or scheme, and to explain how the police acquired Petitioner's DNA for comparison to the samples from the victims in this case. The prosecution argued as much at trial. Furthermore, the risk of unfair prejudice was mitigated by the fact that the trial court instructed the jury on the proper consideration of the evidence. Jurors are presumed to follow the court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481

26

U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors ... take an oath to follow the law as charged, and they are expected to follow it."). Petitioner fails to show that the admission of the other acts evidence was erroneous or, more importantly for purposes of habeas review, that it rendered his trial fundamentally unfair.

Lastly, the application of Mich. Comp. Laws § 768.27a in this case did not violate the Ex Post Facto Clause of the United States Constitution. The Ex Post Facto Clause prohibits any law which: 1) makes an act which had previously been innocent a criminal act; 2) aggravates a crime and makes it more serious than it was when it was committed; 3) changes the punishment and inflicts a greater punishment for the crime than when it was committed; or 4) alters the legal rules of evidence and requires less or different testimony or a lesser quantum of evidence to convict the defendant than was required at the time that the crime was committed. *Carmell v. Texas*, 529 U.S. 513, 522 (2000) (citing *Calder v. Bull*, 3 U.S. 386, 390 (1798)).

In *Carmell*, the Supreme Court held that retrospective application of a Texas law which provided that certain sex offenses could be established solely on the victim's testimony, whereas previously the law required additional corroborating evidence, violated the Ex Post Facto Clause because this legislation "changed the quantum of evidence necessary to sustain a conviction." *Id*. at 530-33. The Supreme Court, however, further explained:

> We do not mean to say that every rule that has an effect on whether a defendant can be convicted implicates the Ex Post Facto Clause. Ordinary rules of evidence, for example, do not violate the Clause....Rules of that nature are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case. More crucially, such rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption.

*Id*. at 533, n. 23.

27

In this case, the application of § 768.27a does not violate the Ex Post Facto Clause because even if the law allows for the admission of evidence to establish Petitioner's propensity to commit the charged acts, which was previously prohibited under Michigan law, it is a procedural rule which does not lower the quantum of proof or the value of the evidence needed to convict a defendant. *See Miracle v. Haas*, No. 2:15-CV-10562, 2016 WL 1583807, *5-6 (E.D. Mich. April 20, 2016) (citing cases and denying habeas relief on same claim); *Niemiec v. Burt*, No. 2:13-CV-10180, 2016 WL 540705, *5-7 (E.D. Mich. Feb. 11, 2016) (same); *Bennett v. Klee*, No. 2:11-CV-14160, 2014 WL 4315877, *16-18 (E.D. Mich. March 11, 2014) (magistrate judge's report recommending denial of similar habeas claims).  Habeas relief is not warranted on this claim.

## V.    Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims.  Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller v. Cockrell*, 537 U.S. 322, 327 (2003).  Having considered the matter, the Court concludes that Petitioner fails to make

28

a substantial showing of the denial of a constitutional right as to his claims.  Accordingly, the Court

**DENIES** a certificate of appealability.  The Court also **DENIES** leave to proceed *in forma pauperis*

on appeal as an appeal cannot be taken in good faith.  Fed. R. App. P. 24(a).  This case is closed.

      **IT IS SO ORDERED**.


Dated:  May 17, 2016                   S/ Sean F. Cox
                                           Sean F. Cox
                                           U. S. District Judge


I hereby certify that on May 17, 2016, the foregoing document was served on counsel of record via electronic means and upon James Buie via First Class mail at the address below:

JAMES BUIE 174915
ST. LOUIS CORRECTIONAL FACILITY
8585 N. CROSWELL ROAD
ST. LOUIS, MI 48880

                                       S/ J. McCoy
                                       Case Manager